# In the United States Court of Federal Claims

No. 18-1907C
(E-Filed: May 8, 2019)[1]

|  |  |  |
|---|---|---|
| VOITH HYDRO, INC., | ) | |
| Plaintiff, | ) ) ) ) | |
| v. | ) ) | Post-Award Bid Protest; |
| THE UNITED STATES, | ) ) | Challenges to Technical Ratings, Past Performance Ratings, and |
| Defendant, | ) ) ) | Best Value Tradeoff Analysis; Motion to Strike Declaration of Source Selection Authority. |
| and | ) ) | |
| ALSTOM RENEWABLE US LLC, | ) ) | |
| Intervenor-defendant. | ) ) | |

<u>David T. Ralston, Jr.</u>, Washington, DC, for plaintiff. <u>Frank S. Murray</u>, <u>Micah T. Zomer</u>, and <u>Krista A. Nunez</u>, of counsel.

<u>Douglas G. Edelschick</u>, Trial Attorney, with whom were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Robert E. Kirschman, Jr.</u>, Director, <u>Douglas K. Mickle</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. <u>Theresa L. Hampson</u>, United States Army Corps of Engineers, Walla Walla, WA, of counsel.

---

[1]     This opinion was issued under seal on April 30, 2019. Pursuant to paragraph (6) of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. A small number of redactions were proposed by defendant and intervenor-defendant. <u>See</u> ECF No. 94. Plaintiff did not agree with the legal basis for these redactions, but also did not object "due to their limited scope and the relative immateriality of the information sought to be redacted." <u>Id.</u> at 2. The court accepts the proposed redactions and notes the cooperation of counsel in this regard. Redactions are indicated by brackets [  ].

Jonathan D. Shaffer, Tysons Corner, VA, for intervenor-defendant. Mary Pat Buckenmeyer and Todd M. Garland, of counsel.

OPINION AND ORDER

CAMPBELL-SMITH, Judge.

This post-award bid protest is before the court on the parties' cross-motions for judgment on the administrative record (AR), brought pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC).[2] The court has reviewed the complaint, ECF No. 1; the AR, ECF Nos. 23-31; the supplement to the AR, ECF No. 48; plaintiff's memorandum in support of its motion for judgment on the AR, ECF No. 55-1; defendant's cross-motion for judgment on the AR, ECF No. 69; intervenor-defendant's cross-motion for judgment on the AR, ECF No. 70; plaintiff's response/reply brief, ECF No. 76; defendant's reply brief, ECF No. 81, and intervenor-defendant's reply brief, ECF No. 82.[3] Oral argument on the parties' cross-motions for judgment on the AR was held on April 10, 2019, addressing the topics set forth in the court's order of April 4, 2019. See ECF Nos. 88 (order), 91 (digital audio recording of oral argument held April 10, 2019).

In addition to the parties' briefing of the merits of this bid protest, the court has before it plaintiff's motion to strike the declaration of Donna L. Street, the Source Selection Authority (SSA) for the procurement at issue in this bid protest. See ECF No. 75. That motion has been fully briefed. See ECF No. 78 (defendant's opposition); ECF No. 79 (intervenor-defendant's response); ECF No. 80 (plaintiff's reply). For the reasons set forth below, plaintiff's motion for judgment on the AR is **DENIED**, and defendant's

---

[2]     Plaintiff's motion was defective under this rule, because it did not include a statement of facts. See RCFC 52.1(c)(1). This defect, along with the length of plaintiff's brief, which, by the court's leave, exceeded the limit set by this court's rules by five pages, permitted plaintiff to produce an extremely detailed and multi-faceted set of challenges to the contract award. See ECF No. 53 (order). The court has considered all of plaintiff's arguments, but, due to the expedited litigation schedule to which the parties and the court agreed, the court will only discuss plaintiff's principal arguments here.

[3]     Additional context for this bid protest may be found in two prior decisions of this court: (1) one addressing access to protected information in the record; and (2) another addressing the scope of the administrative record. See Voith Hydro, Inc. v. United States, 142 Fed. Cl. 233 (2019); Voith Hydro, Inc. v. United States, 141 Fed. Cl. 723 (2019).

and intervenor-defendant's cross-motions for judgment on the AR are **GRANTED**.
Plaintiff's motion to strike the declaration of Donna L. Street is **DENIED**.

I.      Background

    A.      Overview

This bid protest challenges "the evaluation and award decision by the U.S. Army
Corps of Engineers, Walla Walla District [(USACE or agency)] under Request for
Proposals No. W912EF-17-R-0004 [(solicitation or RFP)], which sought proposals for
the design, supply and installation of new turbines in fourteen hydroelectric generator
units at the McNary Lock and Dam Powerhouse located on the Lower Columbia River."
ECF No. 1 at 1.  The protest filed here by Voith Hydro, Inc. (Voith) was preceded by
Voith's post-award bid protest at the Government Accountability Office (GAO).  Id. at 3.
That protest was dismissed as academic when the agency informed the GAO that it
intended to take corrective action to address concerns about the award raised in Voith's
GAO protest.  Id. at 5.  Here, plaintiff argues that the agency's decision to award the
contract to Alstom Renewable US LLC (Alstom), following the corrective action
undertaken by the agency, failed to correct significant evaluation errors committed by the
agency.  Id. at 5-6, 35.

Voith's challenge to the award to Alstom raises three general areas of concern.  In
Count I of the complaint, plaintiff alleges that the evaluation of the offerors' technical
proposals was flawed.  Id. at 41-43.  In Count II, plaintiff alleges that the agency's past
performance evaluation was unreasonable, arbitrary and capricious.  Id. at 43-45.  In
Count III, Voith contends that the price realism analysis undertaken by the agency was
flawed.[4]  Id. at 45-48.  In Count IV, plaintiff contends that these evaluation errors
invalidate the agency's determination that Alstom, not Voith, provided the best value
proposal in this procurement.  Id. at 48.

    B.      Solicitation, as Amended[5]

---

[4]      At oral argument, plaintiff's counsel acknowledged that Voith's challenge to the
agency's price realism analysis is no longer being pursued.  ECF No. 91 at minute 05:00.

[5]      Although the parties have referenced procurement planning documents that
predate the amended solicitation, the court has not found such references to be helpful.
The court must determine whether the proposals received in response to the finalized
version of the solicitation were evaluated pursuant to the evaluation scheme set forth in
the amended solicitation.  Accordingly, the court will not discuss the acquisition plan of
January 24, 2017, the source selection plan (SSP) of April 13, 2017, or superseded
versions of various sections of the solicitation in this opinion.

1.      RFP Provisions of Note

The solicitation issued on April 14, 2017.  See ECF Nos. 23-4 at 387-1460, 23-5, 23-6, 23-7, 23-8, 23-9, 23-10, 23-11 at 1-8.  Amendments 1-7 occurred between May 17, 2017, and December 12, 2017.  See ECF No. 23-11 at 9-1064.  The last two amendments were received after initial proposals had been submitted and governed final proposal revisions submitted by the offerors.  Id. at 840-1062 (Amendment 6), 1063-64 (Amendment 7).

Of note, Amendment 6 contained an updated version of the bid schedule, which described the pricing of adjustable and fixed blade turbines in the following manner:

> The alternate bid tables provide [line items] to complete 8 additional adjustable blade turbines beyond the base 6 in the event that the Government chooses to install fewer than 8 fixed blade turbines. . . .  The 8 additional adjustable blade turbines would replace any number of the 8 fixed blade turbines. . . .  In the instance that additional adjustable blade turbines are added, optional bid items for the supply and installation of additional adjustable blade turbine components would be exercised, concurrent with a modification to deduct the same number of fixed blade turbine component bid items.

Id. at 842.  In short, the base projection was for 6 adjustable blade turbines and 8 fixed blade turbines, for a total of 14 turbines to be installed.  The solicitation included, however, line items for 22 turbines (6 base adjustable blade, 8 optional adjustable blade, and 8 base fixed blade).

As part of Amendment 5, which issued before initial proposals were received, the agency set forth a revision to the list of Federal Acquisition Regulation (FAR) provisions which would govern the contract as to construction activities.[6]  Id. at 799-831.  Among the identified contract provisions was FAR 52.217-7 ("Option for Increased Quantity – Separately Priced Line Item (MAR 1989)").  ECF No. 23-11 at 808-17.  The same FAR provision, FAR 52.217-7, was included as well under the contract's "supply" FAR provisions, but the supply clause cross-referenced the construction clause and indicated that the information included under the FAR 52.217-7 clause for construction also governed the supply elements of this contract.  ECF No. 23-4 at 495.

---

[6]      All citations are to the 2018 version of Title 48 of the Code of Federal Regulations.

Another FAR provision incorporated into the solicitation language by full text remained unchanged throughout the amendments of the solicitation: FAR 52.217-5, Evaluation of Options (JUL 1990). This regulation states in its entirety:

> Except when it is determined in accordance with FAR 17.206(b) not to be in the Government's best interests, the Government will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement. Evaluation of options will not obligate the Government to exercise the option(s).

ECF No. 23-4 at 475. The court now turns to the evaluation criteria set forth in Amendment 3 of the solicitation.

### 2.    Evaluation Scheme

This solicitation is for a fixed-price with economic price adjustment contract. ECF No. 23-11 at 578; see also ECF No. 23-4 at 474. Award in this negotiated procurement would made on a best value tradeoff basis. ECF No. 23-11 at 578, 580. Four evaluation factors would be considered in the best value analysis, only three of which are relevant to Voith's protest: Technical, Past Performance and Price. Id. at 580. The non-price factors, taken together, were significantly more important than the price factor. Id. Technical and Past Performance were equal in importance. Id.

### a.    Technical, Factor I

There were five subfactors in Factor I, listed here in order of their importance: (A) hydraulic design, modeling, and analysis experience; (B) technical work plan and schedule; (C) turbine component design, manufacture, and installation experience; (D) management and quality control; and (E) unit stator winding design, manufacture, and installation experience. Id. Within the Technical factor, the agency would identify "strengths, deficiencies, weaknesses, risks and uncertainties." Id. at 585. The evaluation of Factor I would produce one of the following ratings: Outstanding, Good, Acceptable, Marginal, Unacceptable. Id.

### b.    Past Performance, Factor II

Voith challenges virtually every aspect of the Past Performance evaluation conducted by the agency, so the court, with some alterations of formatting, reproduces almost the entire evaluation section addressing Factor II here. Generally, there were "three aspects to the past performance evaluation: Recency, Relevancy (including context of data) and Quality (including general trends in contractor performance and source of information)." Id. Further, the solicitation stated as follows:

> The Government will focus its inquiries on the offeror's (and major sub-contractors') record of performance as it relates to all solicitation

requirements, including price, schedule, performance and management of sub-contractors. Major sub-contractors are defined as members of an offeror's overall team who are expected to perform ten (10) percent or more of the proposed effort.  Therefore, offerors are reminded to include the most current and relevant past performance efforts (within the past fifteen years) in their proposal.  Absent any current and relevant past performance history or when the performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned, the offeror will be assigned an "unknown confidence rating" and its proposal will not be evaluated either favorably or unfavorably on past performance.  The Government may use data provided by the offeror in its proposal and data obtained from other sources, including data in Government files or data obtained through interviews with personnel familiar with the contractor and their current and past performance under Federal, State or Local government or commercial contracts for same or similar services as compared to the North American Industry Classification System NAICS 237990, Other Heavy and Civil Engineering Construction.  Data submitted by the offeror or gathered from other sources by the government in conducting performance risk assessments shall not extend past fifteen years prior to the issue date of the RFP, but may include performance data generated during the past fifteen years without regard to the contract award date.  **[Contractor Performance Assessment Report System] CPARS data is limited to the past 6 years.  Offeror's should provide additional performance data for projects beyond 6yrs.**

Offerors should submit all Government and/or commercial contract numbers and descriptions for the prime offeror and each major sub-contractor in performance or awarded during the past fifteen years, from the issue date of this RFP, which are relevant to the efforts required by this RFP.

RECENCY; The Government will evaluate recency by examining the offerors' record of past performance and to assess the time period during which the offeror's past performance is considered relevant.

RELEVANCY:  The Government will evaluate those aspects of an offeror's history of contract performance that would provide the most context and give the greatest ability to measure whether the offeror will successfully satisfy the current requirement.  This evaluation will include all aspects of the offeror's execution of schedule, performance, customer support and subcontracting plan for these projects and the offeror's record of: 1) Conforming to specifications and standards of good workmanship; 2) Maintaining program execution within price; 3) Adherence to contract schedules, including the administrative aspects of performance; 4) Ability to resolve technical and manufacturing problems quickly and effectively;

5) Businesslike concern for the interest of its customers; 6) Establishing and maintaining adequate management of sub-contractors; and 7) Compliance with subcontracting plans submitted on previous projects.

ECF No. 23-11 at 585-86.  The evaluation of relevancy, governed by the extent that the present/past performance effort involved "the scope and magnitude of effort and complexities this solicitation requires," would produce one of the following ratings: Very Relevant, Relevant, Somewhat Relevant, or Not Relevant.  Id. at 586-87.

As for quality, the RFP contained the following information:

The third aspect of the past performance evaluation is to establish the overall quality of the offeror's past performance.  The quality past performance evaluation conducted gathers information from the offeror's customers to determine how well the offeror performed those past contracts.  This quality assessment will be reflected in the overall confidence assessment described below.

Id. at 587.

Finally, another metric used to evaluate Past Performance was the Performance Confidence Assessment (PCA).  Id.  Where recent and relevant performance information was available, the PCA would show the level of the government's "expectation that the offeror will successfully perform the required effort."  Id.  One of the following ratings would be assigned in those circumstances:  Substantial Confidence, Satisfactory Confidence, Limited Confidence or No Confidence.  Id. at 587-88.  If, however, "no recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned," a Neutral Confidence rating would be the PCA for that offeror.  Id. at 587.  The Source Selection Evaluation Board (SSEB) would determine a "single consensus performance confidence assessment," or PCA, for each offeror.  Id.

c.      Price, Factor IV

The most relevant statements in the solicitation regarding the evaluation of each offeror's price are as follows:

The Government will evaluate offers for award purposes by adding the total price for all options to the total price for the base requirements. . . . Evaluation of options will not obligate the Government to exercise the option(s).  The Government will evaluate offers for award purposes by evaluating the prices proposed in the Bid Schedule.  The offeror must provide a price proposal by completing the Bid Schedule as instructed in Section 00100.

7

ECF No. 23-11 at 589.  Price, although significantly less important than the combined non-price evaluation factors, was part of an integrated tradeoff analysis to determine the best value proposal:

> The award will be made based on the best overall (i.e., best value-tradeoff) proposal that is determined to be the most beneficial to the Government based on an integrated assessment, with appropriate consideration given to the four (4) evaluation factors:  I. Technical, II. Past Performance, III. Small Business Participation, and IV. Price.

Id. at 580.

As defendant notes, the number of Contract Line Item Numbers (CLINs) in the bid schedule was greater than 250.  ECF No. 69 at 11.  By the court's count, there were approximately 275 CLINs in the finalized bid schedule, along with twenty-two "rate schedule" items.  See ECF No. 23-11 at 844-900.  Of the CLINs in the bid schedule, approximately 135 CLINs were specifically identified as optional, as set forth in the list of optional CLINs in the contract clause incorporating FAR 52.217-7, Option for Increased Quantity – Separately Priced Line Item (MAR 1989).  See ECF No. 23-11 at 808-17.

C.      Award to Alstom and Voith's GAO Protest

Once the SSA reviewed the offerors' final proposal revisions that had been submitted after discussions, she determined that Alstom provided the best value proposal.  ECF No. 30-1 at 649-50.  The award decision was posted on a government website on March 21, 2018.  Id. at 700.  Voith was notified of Alstom's contract award on the same day, and the agency held an oral debriefing for Voith on March 28, 2018.  ECF No. 31-1 at 76-77, 113-36.

Voith filed its protest with the GAO on April 9, 2018; the agency issued a stop work notice to Alstom on April 10, 2018.  Id. at 158-256.  During the course of Voith's protest at the GAO, the agency informed the GAO, on July 3, 2018, that the USACE intended to take corrective action.  ECF No. 31-3 at 209-10.  The agency intended to reevaluate the proposals in the competitive range in a variety of ways.  Id. at 209.  Most pertinent here, (1) the Source Selection Advisory Council (SSAC) would conduct a new Technical, Factor I, evaluation of proposals; (2) the SSA would reassess past performance data so that the agency could reevaluate Past Performance, Factor II;  and (3) the agency would "perform a new comparative analysis and a new best value determination that comports to the solicitation requirements."  Id. at 209-10.  On July 9, 2018, the GAO dismissed Voith's protest as academic.  Id. at 211-12.

D.      Second Award Decision in Favor of Alstom's Proposal

8

The USACE again awarded the contract to Alstom on November 16, 2018, and notified Voith of the award on the same day.  ECF No. 31-5 at 6-11.  To be clear, it is that November 16, 2018 award to Alstom that is the subject of plaintiff's bid protest here.[7]  The following documents contain the support for the agency's second award to Alstom:  (1) the SSEB's revised Final Evaluation Report, addressing actions taken during August 14-25, 2017, January 16-19, 2018, July 16-20, 2018, and October 4-5, 2018, see ECF No. 31-4 at 17-171; (2) the SSAC's revised report, containing the original report of February 21, 2018, as revised on October 23, 2018, see id. at 172-211; (3) the SSA's Source Selection Decision Document (SSDD), dated November 16, 2018, see id. at 212-83; ECF No. 31-5 at 1-5; and (4) underlying documents from the offerors' final proposal revisions and other underlying documents in the agency's files, scattered throughout the AR.  The court reserves a more detailed discussion of documents contained in the AR for its analysis of plaintiff's challenges to the agency's evaluation of the Technical and Past Performance factors, and Voith's challenge to the SSA's best value determination in favor of Alstom's proposal.

II.     Bid Protest Standard of Review

A.     Arbitrary and Capricious Standard

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2012)]:  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure.  Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)).  "The arbitrary and capricious standard applicable [in bid protests] is highly deferential."  Advanced Data Concepts, 216 F.3d at 1058.

De minimis errors in the procurement process do not justify relief.  Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing Andersen Consulting v.

---

[7]     The court has considered all of the evidence to which plaintiff has pointed regarding the evaluation of proposals before the agency undertook its corrective action.  None of that evidence convinces the court that it should alter its focus from the documents in the administrative record which are directly relevant to the revised evaluation of proposals that occurred after Voith's GAO protest was dismissed as academic.

United States, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)).  The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. Id. (citing CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed. Cir. 1988)). Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (Motor Vehicle Manufacturers)) (alteration in original).  The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (citation omitted).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

B.    Permanent Injunctive Relief

As the Federal Circuit has held:

> In deciding whether a permanent injunction should issue, a court considers:  (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).

III.   Analysis

Voith's protest can be divided into three principal topic areas:  Technical evaluation, Past Performance evaluation and best value analysis, with some natural overlap between the first two topics and the weighing of all evaluation criteria to determine the proposal providing the best value to the USACE.  Voith's three main sub-topics regarding the agency's Technical evaluation are summarized by plaintiff as the agency's failure to consider Voith's advantages, and Alstom's disadvantages, in these areas:

1.   Voith's Advantage in Demonstrating the Ability to Achieve Acceptable Performance Without Costly Optional Draft Tube Modifications[;]

2.   Voith's Recognition, and Alstom's Failure to Recognize, the Need for a 292-Inch Diameter Adjustable-Blade Design[; and the]

3.   SSA's Failure to Consider the Operational and Power Generation Benefits of Voith's Better-Performing Design[.]

ECF No. 55-1 at 2.

There is a similar division of Voith's challenge to the agency's Past Performance evaluation, in this instance into four sub-topics. Each of the following sub-topics is cited as evidence that the agency's evaluation rating for Past Performance (and in particular, the PCA) was "Irrational, Contrary to the Underlying Evaluation Record, the Result of Disparate Treatment, and Performed Contrary to the Solicitation and Source Selection Plan [(SSP)] Terms":

1.   The SSAC and SSA Irrationally Failed to Acknowledge Unfavorable Alstom Performance Information Documented in the Evaluation Record[;]

2.   The SSA's PCA Analysis Constituted Impermissible Disparate Treatment by Failing to Pursue or Obtain Performance Feedback for Alstom Projects Identified in Its Proposal as Most Relevant to the McNary Effort[;]

3.   The SSA's PCA Violated the Solicitation Evaluation Criteria[; and]

4.   The Agency Violated the SSP and Solicitation Terms Reserving Exclusive Responsibility for Assigning PCA Ratings to the SSEB[.]

Id. at 2-3.

Lastly, Voith's challenge to the SSA's best value analysis could be divided into two main sub-topics. First, according to Voith, the USACE failed to consider the economic value of certain advantages in Voith's proposal, especially the cost of "draft tube modifications," and the value of Voith's "ability to meet or exceed hydraulic performance requirements for output, efficiency, and operational flexibility." Id. at 48-49. Second, Voith asserts that the agency improperly used an illusory price to measure the additional costs of Voith's superior proposal. Id. at 45-48. Plaintiff contends that these flaws in the best value analysis rendered the award decision irrational and contrary to regulation. Id. at 45.

For each of the evaluation areas criticized in this protest, Technical and Past Performance, the court will begin with a review of the evaluation ratings assigned to Alstom and Voith.  The court will consider the findings of the SSEB, the SSAC, and the SSA, as set forth in the finalized SSEB and SSAC reports and the SSDD of November 16, 2018.  The court will then address the parties' arguments regarding the alleged evaluation flaws identified in Voith's sub-topics.

For the SSA's best value tradeoff analysis, the court's inquiry is more straightforward and poses three questions.  First, did the SSA adhere to the solicitation's evaluation criteria when she failed, in plaintiff's view, to acknowledge the value of certain Voith "advantages"?  Second, did the evaluated prices used by the SSA in her best value tradeoff analysis comport with the evaluation scheme set forth in the solicitation?  And if the answer to these two questions is yes, because the SSA's best value tradeoff analysis was consistent with the evaluation scheme set forth in the solicitation, the court must answer a third question:  is plaintiff's challenge to the SSA's best value tradeoff analysis timely?

    A.      Technical

        1.      Evaluation Results

            a.      Alstom

The five-member SSEB (reduced from six original members by a retirement) came to consensus on most of the ratings for Alstom on Technical, Factor I, but a minority report expressed the views of two of the five SSEB members.  ECF No. 31-4 at 24, 28, 170-71.  The SSEB minority expressed no concerns regarding Alstom's proposal on Technical subfactors (C) and (E), which were "Turbine component design, manufacture, and installation experience" and "Unit stator winding design, manufacture, and installation experience."  Id. at 170-71.  The SSEB minority did comment however, on their perception of risks related to Technical subfactors (A), (B) and (D), which were "Hydraulic design, modeling, and analysis experience," "Technical work plan and schedule," and "Management and quality control."  Id.  These views led the SSEB minority to conclude that Alstom's performance risk on Factor I was low to moderate, and that Alstom should have received a Good rating, not an Outstanding rating, on the Technical evaluation.  Id. at 170.

The SSEB majority disagreed, and awarded Alstom an Outstanding rating on Factor I.  Id. at 24.  The entire SSEB unanimously found that Alstom's ratings on the five Technical subfactors, (A) through (E), were, respectively, Outstanding, Good, Outstanding, Good, and Outstanding.  Id. at 24, 28-29, 170.  The entire SSEB reached consensus regarding Alstom's strengths (32), weaknesses (5), and uncertainties (2) for the Technical subfactors.  Id. at 29-43.

The SSAC conducted an "independent review of the Source Selection Evaluation Board (SSEB) evaluation results and ratings assigned," as well as a "comparative analysis of each proposal . . . document[ing] the risks in each proposal." Id. at 176.  The SSAC's report's goal was to offer "recommendations to the Source Selection Authority (SSA) for consideration in making an ultimate selection decision on the best value for the Government."  Id.  There were five SSAC members.  Id. at 177.

The SSAC acknowledged the minority report from the SSEB which concluded that Alstom's proposal posed a higher performance risk than Voith's proposal.  Id. at 180.  The SSAC, however, sided with the SSEB majority, and found that Alstom's Outstanding rating for Technical, Factor I, was justified due to a low risk of unsuccessful performance.  Id.  The SSAC then reviewed each of the Technical subfactors and created a list of "advantages and disadvantages" that the SSAC found in the proposals before it.  Id. at 181-88.

The SSAC concurred with the Outstanding ratings on Technical subfactors (A), (C), and (E), awarded to both Alstom and Voith by the SSEB.  Id. at 181, 185, 187.  The SSAC also concurred with the ratings given by the SSEB for subfactor (D), which were Good for Alstom and Outstanding for Voith.  Id. at 185.  For Technical subfactor (B), the SSAC again concurred with the ratings given by the SSEB for this subfactor (Good for Alstom and Outstanding for Voith).  Id. at 182.  The SSAC characterized one of the weaknesses that the SSEB had assigned in the Technical subfactor (B) to Alstom as a "slight disadvantage," related to Alstom's "performance curves."  Id. at 184.

The remainder of the SSAC's comparative analysis regarding Technical, Factor I, was devoted to the topic of the performance risk of Alstom's and Voith's proposals.  Id. at 204-11.  For example, the SSAC calculated the potential costs, measured in dollars and in schedule delays, of the remaining weaknesses, after final proposal revisions, in each proposal.  Id. at 206-07.  The SSAC's performance risk analysis was also summarized in narrative form.  Id. at 207-08.

The SSA produced a Source Selection Decision Document (SSDD) on November 16, 2018.  See ECF No. 31-4 at 212-83; ECF No. 31-5 at 1-5.  As to Alstom's rating for Technical, Factor I, the SSA agreed with the SSAC and the majority of the SSEB that the rating for Alstom should be Outstanding on this factor.  ECF No. 31-4 at 228.  The SSA's review of Alstom's strengths, weaknesses and uncertainties in the Technical subfactors largely tracked those discussed in the SSEB's report, with minor deviations.  Id. at 228-41.

Much like the SSAC, the SSA performed a comparative analysis of the proposals for Technical, Factor I, "[b]ased on the strengths and weaknesses identified previously in" the SSDD.  Id. at 272-74.  For Technical subfactor (A), Alstom had a "slight disadvantage."  Id. at 272.  For Technical subfactor (B), Alstom merited a Good rating, whereas Voith merited an Outstanding rating.  Id.; ECF No. 31-5 at 3.  For Technical

subfactor (C), the SSA mentioned both that Voith had a slight advantage in one respect, but that generally "neither ha[d] an advantage." ECF No. 31-4 at 274.  For Technical subfactor (D), the SSA noted that Voith had an advantage.  Id.  Finally, for Technical subfactor (E), the SSA determined that Alstom had a slight advantage.  Id.

The SSA concurred with the SSAC's risk analysis of the proposals.  In the SSA's view, when all of the remaining weaknesses in the proposals were considered, these "would present low risk to the execution of the contract and will not have a significant cost or schedule impact over the life of this contract."  ECF No. 31-5 at 2.  The SSA concluded that Voith had "an advantage under Factor I, technical for their relevant project experience."  Id. at 3.  The SSA also found that Voith had "an overall advantage" on the non-price evaluation factors.  Id. at 4.

> b.    Voith

The five-member SSEB came to consensus on all of the ratings for Voith on Technical, Factor I.  ECF No. 31-4 at 57.  The SSEB awarded Voith an Outstanding rating on Factor I.  Id.  The entire SSEB unanimously found that Voith's ratings on the five Technical subfactors, (A) through (E), were, respectively, Outstanding, Outstanding, Outstanding, Outstanding, and Outstanding.  Id.  The entire SSEB reached consensus regarding Voith's strengths (49), weaknesses (0), and uncertainties (1) for the Technical subfactors.  Id. at 58-69.

The SSAC report did not mention any notable differences between its view, and the SSEB's view, of the ratings for Voith on the Technical subfactors, (A) through (E), or for the overall Technical rating for Voith of Outstanding.  Id. at 180-88, 210.  Just as was the case for Alstom, the SSAC measured the performance risk of the remaining weaknesses in Voith's proposal in dollars and schedule delays.  Id. at 204-09.  The SSAC noted that Alstom's remaining weaknesses, in all evaluation criteria combined, were greater in number than those of Voith, and might "translate to cost and schedule impacts."  Id. at 208.

The SSA's comparative analysis of the proposals on Technical, Factor I, has been largely summarized earlier in this opinion section.  As to Voith's Factor I ratings, the SSA agreed with the SSAC and the unanimous SSEB that Voith was Outstanding on the factor overall, and Outstanding on subfactors (A) through (E).  ECF No. 31-5 at 3.  The SSA's review of Voith's strengths, weaknesses and uncertainties in the Technical subfactors tracked those discussed in the SSEB's report in every respect.  ECF No. 31-4 at 241-53.

> 2.    Evaluation Errors Alleged by Voith

> a.    Draft Tube Modifications

Plaintiff defines a draft tube as "the conduit at the exit of a turbine through which the water discharged from the turbine is carried away."  ECF No. 55-1 at 13.  Both offerors were required to price draft tube modifications at the McNary hydroelectric facility in a number of optional CLINs.  See, e.g., ECF No. 69 at 24-25 (citing the CLINs that include draft tube modifications).  According to plaintiff, the SSA failed to recognize that Voith's design would not need draft tube modifications, whereas Alstom's design would.  See ECF No. 55-1 at 15 ("In sharp contrast to Alstom's 'draft tube modifications required' design, Voith proposed mature, detailed runner designs, backed by modeling results indicating that Voith's designs can readily achieve and even exceed the specified performance targets with the existing McNary draft tubes.").  According to plaintiff, "[t]he SSA's failure to take this striking Voith proposal advantage into account was irrational."  Id. at 18 (citing Motor Vehicle Manufacturers, 463 U.S. at 43).

The parties have thoroughly examined and parsed the solicitation, Voith's and Alstom's final proposal revisions, documentation of the agency's evaluation of those proposals, and documents that were produced at the GAO before the agency decided to take corrective action in this procurement.  See ECF No. 55-1 at 13-20 & nn.1-3; ECF No. 69 at 24-25 & n.2; ECF No. 70 at 30-37; ECF No. 76 at 11-12 & nn.6-7, 21-26; ECF No. 81 at 5; ECF No. 82 at 11-14.  After consideration of all of these portions of the administrative record, the court finds that the SSA could rationally conclude that both Voith's and Alstom's proposals were likely to require draft tube modifications.

Indeed, the USACE expert who consulted with the SSAC conveyed this opinion to the SSAC before the SSAC made its final recommendation to the SSA.  See ECF No. 31-3 at 171 (stating that "each offeror will need some sort of draft tube modification to achieve an acceptable design"); ECF No. 31-4 at 183-84, 273 (commenting on the expert's opinion as to the "water passageway geometries at McNary").  The court notes, too, that the agency's solicitation sought offers that would incorporate design changes during the collaboration between the USACE and the contractor.  See ECF No. 70 at 30 ("The RFP provides for a design-supply-install contract, not proposals for a fixed design and build only.  The RFP demanded an extensive iterative design phase.").  In these circumstances, the court does not find that the SSA's evaluation of Voith's proposal, or of Voith's costs for draft tube modifications, was irrational, arbitrary or capricious.

Voith also argues that the SSAC and the SSA erroneously characterized Voith's proposal as being founded on its Ice Harbor design, while at the same time concluding that Alstom's proposal was founded on the existing water passageways at the McNary facility.  ECF No. 55-1 at 18-19 (citing ECF No. 31-4 at 182, 273).  As defendant and intervenor-defendant have noted, however, the statement in the SSAC's final report is supported by a passage in Voith's final proposal revision.  See ECF No. 69 at 25 (citing ECF No. 29-3 at 47-48); ECF No. 70 at 36 (citing ECF No. 29-3 at 47).  The court has compared this passage in Voith's proposal, ECF No. 29-3 at 47-48, with other pages of Voith's proposal that plaintiff points to as proof that the SSAC and the SSA committed a

factual error, ECF No. 29-2 at 267; ECF No. 29-3 at 50, 60, 76; see also ECF No. 55-1 at 15 n.1; ECF No. 76 at 24.

The record is subject to a variety of interpretations, but the SSAC was correct to note that Voith referenced its Ice Harbor project and used the terms "baseline" and "baseline model" when doing so. ECF No. 29-3 at 47-48. The court finds that plaintiff has not shown that the SSAC or the SSA committed a factual error in the description of Voith's and Alstom's proposals. Nor has plaintiff shown that the reference to Ice Harbor was the source of any significant, prejudicial evaluation error. Plaintiff's challenge to the draft tube modifications aspect of the agency's evaluation of proposals on Technical, Factor I, fails to show that the agency's award decision was irrational, arbitrary or capricious.

b.      Adjustable Blade Diameter

Plaintiff argues that the SSA did not take into account a clear advantage of Voith's proposal, which, in plaintiff's view, reflected a better understanding of the adjustable blade design that would reduce fish mortality at McNary to acceptable levels. ECF No. 55-1 at 20-21. Voith's optimal fish-friendly design is referred to by plaintiff as the "292-inch, six-blade adjustable blade runner." Id. at 20. In plaintiff's view, Alstom's proposal was inferior due to its reliance on a 280-inch adjustable blade runner. Id. at 22 (noting Alstom's focus on a 280-inch, as opposed to a 292-inch, adjustable blade design in its proposal). These adjustable blade "runners" are also referred to by plaintiff as "Kaplan (adjustable-blade) turbine runners." See ECF No. 76 at 26. Plaintiff's argument in this regard, with its emphasis on the distinction between 292-inch adjustable blades and 280-inch adjustable blades, states that

> it was irrational for the SSA to have ignored in her tradeoff analysis and best-value determination the comparative advantage of Voith's proposed Kaplan runner design, as compared to Alstom's, with respect to the lower risk of unsuccessful performance and lower likelihood of schedule impact from additional design iterations.

Id. at 28.

Defendant notes that Voith was awarded more strengths than Alstom for Technical, Factor I. ECF No. 69 at 26. Indeed, Voith received a higher rating on Technical subfactor (B), and more strengths within this subfactor, which includes turbine runner configurations. ECF No. 31-4 at 24, 33, 60-61. The record shows that Voith was awarded a strength related to its reliance on a 292-inch adjustable blade design. Id. at 61. The SSA mentioned this strength in the SSDD as well. Id. at 244. The court concludes that the SSA did take the advantage cited by Voith into account. Plaintiff's challenge to this aspect of the evaluation is, in the court's view, a mere disagreement with the agency's highly discretionary technical evaluation of proposals. See, e.g., E.W. Bliss Co.

v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (stating that "technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess") (citations omitted).

In a related argument, plaintiff argues that the agency erred when it failed to factor in all of the costs that would flow from Alstom changing from a 280-inch design to a 292-inch design for the Kaplan turbine runners.  ECF No. 55-1 at 24-25.  Defendant notes that the SSA discussed this performance risk in the SSDD in the context of a price realism analysis of Alstom's proposal.  ECF No. 69 at 27 (citing ECF No. 31-4 at 268).  The SSAC also factored in performance risks flowing from the costs of Alstom's potential redesign of turbine runners, in general.  See ECF No. 31-4 at 206-08.

The SSA agreed with the SSAC as to the performance risks in Alstom's proposal.  ECF No. 31-5 at 2.  The SSA found that the performance risk for both Voith's and Alstom's proposals was low, and that these proposals' weaknesses would "not have a significant cost or schedule impact over the life of the contract."  Id.  Based on the record before the court, the SSA's consideration of the costs of Alstom's potential redesign of its adjustable blade runners has not been shown to be irrational, arbitrary or capricious.  This protest ground, too, is unavailing.

### c.      Output, Efficiency and Operation Flexibility

Plaintiff states that the SSA erred when she did not take into account the fact that Voith's designs "exceeded the performance targets for efficiency and power output" at McNary, and offered operational flexibility.  ECF No. 55-1 at 25-26.  Indeed, plaintiff asserts that the net present value of these advantages in Voith's proposal was "roughly $65 million."  Id. at 26.  In plaintiff's reply brief, Voith argues that the SSA irrationally failed to consider these advantages in her tradeoff analysis, despite having noted various strengths in Voith's proposal in an earlier section of the SSDD.  ECF No. 76 at 28-29.  Plaintiff places specific emphasis on the SSA's discussion of Technical subfactor (B).  Id.

The court agrees with plaintiff that the SSA never identified advantages in Voith's proposal worth roughly $65 million in net present value in the SSDD.  But the court also agrees with defendant that the SSA rationally considered Voith's advantages in Technical, Factor I, and that the SSDD is neither incomplete nor defective in this regard.  ECF No. 69 at 29.  Moreover, the court agrees with Alstom that the weight given to Voith's strengths in Technical, Factor I, has not been shown to be irrational, and that the SSA's consideration of Voith's proposal under this evaluation factor was "in accordance with the RFP factors."  ECF No. 70 at 39.  The court concludes, therefore, that the SSA's consideration of Voith's performance efficiencies survives the arbitrary and capricious standard of review applicable here.  As to plaintiff's critique of the SSA's best value tradeoff analysis, alleging that the SSA irrationally ignored the quantifiable value of Voith's performance efficiency advantages, the court addresses that topic in the best value tradeoff section of this opinion.

B.     Past Performance

1.     Evaluation Results

It is helpful to remember that:  (1) a Past Performance evaluation was completed before the initial award to Alstom and before the corrective action was undertaken by the agency; (2) additional Past Performance information became available to the evaluators once the corrective action was undertaken by the agency; and (3) the agency produced a final Past Performance evaluation.  This opinion section will focus on the results of the agency's final evaluation of Past Performance, Factor II, of the parties' proposals.  The process for evaluating Past Performance will be discussed below under the headings devoted to Voith's challenges to the agency's Past Performance evaluation.

a.     Alstom

Some of the principal Past Performance ratings by the agency are summarized here.  The SSEB compiled data from Past Performance Questionnaires (PPQs), and based on this raw data, the SSAC found that Alstom had the following percentages of customer ratings:  Marginal (0%), Satisfactory (12.2%), Very Good (52.8%) and Excellent (35%), with a combined percentage for Very Good/Excellent ratings of 87.8%.  ECF No. 31-4 at 192; see also ECF No. 30-1 at 203.  The "most recent and most relevant" CPARS reports available for Alstom were summarized by the SSAC as providing the following combined Very Good/Excellent customer ratings:  32.4%, 42.5%, 46.2% and 65%.  ECF No. 31-4 at 194-95.

The SSAC, relying on the SSEB's findings, concluded that neither Alstom nor Voith had deficiencies in Past Performance, Factor II.  Id. at 197.  The SSAC, again relying on the SSEB's findings, concluded that Alstom had 3 strengths, 4 weaknesses and 1 uncertainty in Past Performance.  Id.  Agreeing with the SSEB, the SSAC concluded that Alstom's Past Performance data was Relevant.  Id. at 200.  Disagreeing with the SSEB, the SSAC rated Alstom on the PCA metric as providing Substantial Confidence. Id.

Comparing the Past Performance of these two offerors, the SSAC concluded that "Alstom has a slight performance confidence advantage over Voith with regard to successful performance for the McNary Turbine Replacement project."  ECF No. 31-4 at 200.  The SSA largely concurred with the SSAC, noted two additional strengths for Alstom, and also removed the single uncertainty regarding Alstom's Past Performance. Id. at 253-59, 278-82.  The SSA's rating for Alstom for Past Performance, Factor II, was Relevant/Substantial Confidence.  ECF No. 31-5 at 3.  The SSA, in her integrated analysis of all of the evaluation factors, found that "Alstom ha[d] an advantage over Voith" in Past Performance.  Id. at 4.

b.     Voith

18

Some of the principal Past Performance ratings by the agency are summarized here.  The SSEB compiled data from PPQs, and based on this raw data, the SSAC found that Voith had the following percentages of customer ratings:  Marginal (0.6%), Satisfactory (11.8%), Very Good (38.2%) and Excellent (49.4%), with a combined percentage for Very Good/Excellent ratings of 87.6%.  ECF No. 31-4 at 192; see also ECF No. 30-1 at 230.  The "most recent and most relevant" CPARS reports available for Voith were summarized by the SSAC as providing the following combined Very Good/Excellent customer ratings:  32%, 31.3%, 45.1% and 25.8%.  ECF No. 31-4 at 194-95.

The SSAC, relying on the SSEB's findings, concluded that neither Alstom nor Voith had deficiencies in Past Performance, Factor II.  Id. at 197.  The SSAC, again relying on the SSEB's findings, concluded that Voith had 5 strengths, 5 weaknesses and 0 uncertainties in Past Performance.  Id.  Agreeing with the SSEB, the SSAC concluded that Voith's Past Performance data was Very Relevant.  Id. at 198.  Disagreeing with the SSEB, the SSAC rated Voith on the PCA metric as providing Satisfactory Confidence. Id.

Comparing the Past Performance of these two offerors, the SSAC concluded that "Alstom has a slight performance confidence advantage over Voith with regard to successful performance for the McNary Turbine Replacement project."  ECF No. 31-4 at 200.  The SSA largely concurred with the SSAC, and did not change any of the strengths or weaknesses for Voith in Past Performance.  Id. at 259-64, 276-77, 279-82.  The SSA's rating for Voith for Past Performance, Factor II, was Very Relevant/Satisfactory Confidence.  ECF No. 31-5 at 3.  The SSA, in her integrated analysis of all of the evaluation factors, found that "Alstom ha[d] an advantage over Voith for" Past Performance.  Id. at 4.

2.      Evaluation Errors Alleged by Voith

a.      Unfavorable Alstom Past Performance Information

Voith contends that three types of negative Past Performance information were irrationally ignored by the SSAC and the SSA.  First, according to Voith, the agency obtained customer feedback from [  ] during a telephone interview that was unfavorable to Alstom.  ECF No. 55-1 at 28-32.  Second, plaintiff argues that the fact that one of Alstom's customers, [  ], refused to provide feedback during a telephone interview was "even more damning."  Id. at 32-33.  Third, again according to Voith, the SSAC and the SSA mischaracterized the overall tone of the [  ] project CPARS, the most recent CPARS considered by the agency for Alstom.  Id. at 33-36.

More generally, Voith contends that evidence of the Past Performance evaluation deliberations of the agency before the GAO protest, when compared to the final Past Performance evaluation by the SSAC and the SSA, shows that the SSAC and the SSA

irrationally ignored negative information in a way that incorrectly improved Alstom's
Past Performance ratings.  See id. at 28 ("Essentially, both entities created a new set of
'alternate facts,' at odds with the underlying evaluation record, to avoid acknowledging
that the adverse Alstom performance information they had previously ignored actually
contradicted their narrative of Alstom's superior recent/relevant performance, which they
had used to reverse the SSEB's consensus-assigned PCA ratings, to Alstom's benefit and
to Voith's prejudice.").  Both defendant and Alstom contend that the SSA's Past
Performance ratings for Alstom were rational and supported by the record.  The court
must agree.

First, as defendant notes, the phone interviews with [  ] and [  ] were given little
weight by the SSAC, as the phone interviews with Alstom's customers "'were limited in
detail and not highly informative and therefore were not considered a substantial source
of past performance information.'"  ECF No. 69 at 30 (quoting ECF No. 31-4 at 199).
The court has carefully reviewed the notes describing the phone interview results, ECF
No. 31-4 at 161; ECF No. 31-5 at 115-17, along with the consideration of these phone
interview records by the SSA and the SSAC, ECF No. 31-4 at 199-200, 282, and defers
to the agency's rational consideration of that customer feedback.  As for the SSAC's
consideration of the [  ] CPARS, the court agrees with Alstom that the SSAC's
categorization of that report as including "'both positive and negative comments'" was
rational.  ECF No. 70 at 45 (quoting ECF No. 31-4 at 278); see also ECF No. 31-4 at 199;
ECF No. 48-1 at 31-34).  In addition, the court has reviewed the documentation
describing the CPARS for Alstom in the record, ECF No. 31-4 at 45-47; ECF No. 48-1 at
31-34, and defers to the SSA's rational analysis of those CPARS, ECF No. 31-4 at 281.

Finally, the court addresses plaintiff's contention that the agency changed facts to
conform with its intent to award to Alstom.  Plaintiff has clarified that Voith does not
accuse the SSA of bias or bad faith.  ECF No. 76 at 30 n.12.  Instead, plaintiff urges the
court to consider the SSA's final Past Performance evaluation of proposals with
"appropriate skepticism" because the evaluation is an example of a post hoc
rationalization for a contract award.  See id. (citing Centerra Grp., LLC v. United States,
138 Fed. Cl. 407, 420 (2018)).

Factually, this case is distinguishable from Centerra.  Here, the SSDD is a
contemporaneous award decision document produced in conformance with proper
reevaluation procedures, whereas in Centerra the agency held improper discussions with
the awardee after requesting a remand to reevaluate proposals.  Id. at 410, 416-19 &
nn.5-6.  In contrast with the "outlier" facts in Centerra, id. at 416 n.6, the record before
the court in this case supports the rationality of the SSA's Past Performance evaluation of
Alstom's proposal, and a presumption of regularity attaches to her analysis.  Info. Tech.
& Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003) (citing
Impresa, 238 F.3d at 1338).  Because the administrative record does not show that the

SSA irrationally ignored negative feedback as she rated Alstom's Past Performance, this protest ground is unavailing.

b.      Disparate Treatment, Failure to Seek Out Information

Briefly summarized, plaintiff contends that the agency's Past Performance evaluation evidenced disparate treatment, because Alstom's Canadian projects were subjected to a less probing analysis than were Voith's American projects.[8]  See ECF No. 55-1 at 36-39.  In support of this protest ground, Voith suggests that the agency should have aggressively pursued additional customer feedback regarding Alstom's Canadian projects.  Id. at 37 ("The absence of PPQs or CPARS reports for these Canadian projects Alstom had identified as most relevant to McNary made it incumbent upon the agency evaluators to obtain feedback from those customers directly, to ensure that both Voith and Alstom were being treated equally by both being rated on the Past Performance factor based on a full and complete record of feedback from the customers of the projects they had self-identified as relevant.").  Defendant and Alstom disagree.

Defendant correctly contends that the agency had sufficient data to perform a rational evaluation of Alstom's Past Performance.  ECF No. 69 at 31.  The government also notes that Voith's American projects, and Voith's robust Past Performance data, contributed to Voith's higher rating on the Relevancy aspect of the Past Performance evaluation.  Id. at 31-32.  Alstom correctly contends that there was no requirement in the solicitation that compelled the agency to redouble its data-gathering activities for Canadian projects.  ECF No. 70 at 47.  Having considered all of the parties' arguments in this regard, plaintiff has not shown that the agency's data-gathering activities for Canadian projects evinced disparate treatment.  Even though Voith's projects supplied the agency with more robust feedback from CPARS, for example, see ECF No. 31-4 at 196, the record shows that the offerors were treated "fairly and impartially," even though they were not treated exactly the same, see 48 C.F.R. § 1.102-2(c)(3) (2018).

c.      PCA Not in Accordance with Evaluation Scheme

Plaintiff's "not in accordance with the evaluation scheme" argument is a two-part challenge to the SSA's Past Performance evaluation of proposals, focused largely on

---

[8]     In its reply brief, plaintiff raises a new disparate treatment argument, contending that the SSA employed a "far-more-forgiving" standard for balancing negative customer feedback with positive customer feedback in her evaluation of Alstom's proposal.  ECF No. 76 at 31, 36.  This argument is untimely and waived.  See, e.g., Arakaki v. United States, 62 Fed. Cl. 244, 246 n.9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete." (citing Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002); Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. 450, 467 (1999))).

Alstom's Past Performance, not Voith's Past Performance.  See ECF No. 55-1 at 39-42. The first allegation is that the SSA improperly resolved an uncertainty in favor of Alstom based on a letter from Alstom, when such uncertainties should only be resolved through additional favorable customer feedback.  Id. at 39-40.  The second allegation is that because Past Performance data considered by the agency must be recent, the SSA's reliance on data for Alstom that was no longer recent invalidated the SSA's PCA for Alstom.  Id. at 40-42.  The court addresses each of these arguments in turn.

Defendant argues that the SSA's decision to remove the uncertainty regarding Alstom's Past Performance was rational, supported by the record, and not contrary to the evaluation criteria in the solicitation.  ECF No. 69 at 32.  Further, defendant states that "Voith does not (and cannot) point to any provision of the RFP that would have required the Corps to disregard Alstom's entire record of past performance and a written assurance that Alstom's 'management team' remained 'the same' after its ownership changed."  Id. (citing ECF No. 31-4 at 247-50).  The court agrees with defendant's assessment that the SSA could rationally remove the uncertainty for Alstom's Past Performance, based on the letter cited, and not violate the evaluation scheme set forth in the solicitation.  Plaintiff did not address defendant's argument in its reply brief.  Thus, plaintiff's challenge to the removal of the uncertainty in Alstom's Past Performance evaluation does not persuade.

The court turns to plaintiff's argument that the agency did not obtain "recent" information, as required by the solicitation, to evaluate Alstom's Past Performance after Voith's GAO protest was dismissed.  One of Alstom's principal arguments in this regard is that the offerors were required to include recent Past Performance information with their proposals, but those same RFP provisions did not require the agency to continuously update Past Performance information as the result of protest delays.  See ECF No. 70 at 49-50; ECF No. 82 at 18-19.  The court finds that the agency complied with the requirements imposed on it under the solicitation, and that any challenge plaintiff now wishes to interpose concerning this requirement is untimely.

The court further finds that the agency's Past Performance evaluation comported with the FAR and binding precedent requiring that an agency conduct rational evaluations of proposals.  Moreover, the court agrees with the government that the solicitation did not require a different analysis of trends in Past Performance than the one the agency conducted here.  See ECF No. 81 at 8-9.  For all of the above reasons, plaintiff's argument that the SSA's PCA was not in accordance with the RFP's evaluation scheme is unavailing.

d.    SSEB's Role in Determining PCA "Usurped"

As stated in one of the subheadings in plaintiff's opening brief, Voith alleges that "[t]he Agency Violated the SSP and Solicitation Terms Reserving Exclusive Responsibility for Assigning PCA Ratings to the SSEB."  ECF No. 55-1 at 42. Defendant responded to this argument with a thorough analysis of the roles of the SSEB,

the SSAC and the SSA, as set forth in relevant record documents and the FAR.  ECF No. 69 at 33-34.  When plaintiff did not respond to the government's analysis of the roles of the SSAC and the SSA, defendant argued, in its reply brief, that this specific challenge to the Past Performance evaluation had been abandoned.  ECF No. 81 at 9.

The court also reads plaintiff's reply brief as evincing an abandonment of this protest ground.  However, at oral argument, plaintiff responded to the court's inquiry as to the status of this particular protest ground, insisting that the argument had not been abandoned, and, indeed, that this argument did not constitute a separate protest ground at all.  ECF No. 91 at minutes 05:00-17:00.  Plaintiff's counsel also asserted that the language the court quoted from plaintiff's brief failed to capture the essence of plaintiff's contentions regarding the role of the SSEB in formulating the PCA for each proposal.

As the court understands the colloquy at oral argument, plaintiff does not contend that the SSA usurped the role of the SSEB in finalizing the PCA ratings.  Instead, Voith contends that the changes that the SSAC made to the PCA ratings determined by the SSEB constitute evidence of disparate treatment, an irrational evaluation, and conduct not in accordance with the SSP.  In the court's view, this reframing of Voith's challenge to the agency's PCA ratings does not assist plaintiff.

As to the argument contained in the text of plaintiff's motion, which asserts that the RFP did not allow the SSAC to modify the SSEB's PCA for the proposals being evaluated, see ECF No. 55-1 at 42-43 (stating that "[t]he SSAC . . . violat[ed] the express terms of the Solicitation, which stated explicitly that the PCA ratings would be assigned by the SSEB, and no other body"), the court deems that position to have been abandoned, and thus, plaintiff's abandoned argument requires no further consideration by the court, see, e.g., Beauchamp Constr. Co. v. United States, 14 Cl. Ct. 430, 435 (1988) (not discussing an argument abandoned by the plaintiff).  Even if this argument were not abandoned, the court agrees with defendant that both the SSAC and the SSA could rationally modify the PCAs assigned by the SSEB, and could do so without violating the terms of the solicitation.

And as to the "evidence of disparate treatment and irrationality" argument plaintiff raises, the record does not support a finding that the SSAC and the SSA acted irrationally, arbitrarily or capriciously when these evaluators changed the PCAs for Voith and Alstom.  As Alstom notes, "the SSAC thoroughly explained its reasons for its comparative assessment and concerns regarding some SSEB ratings," and the SSA's analysis in this regard was similarly grounded in rational decision-making and supported by the record.  See ECF No. 70 at 51 (citing ECF No. 31-4 at 197-201, 280-82).  The court concludes that plaintiff has not shown that the modification of the PCAs for Voith and Alstom by the SSAC and the SSA was either irrational or improper.

C.    Best Value Tradeoff

1.      SSA's Alleged Failure to Value Voith's Advantages

Plaintiff argues that the SSA irrationally ignored the costs of the draft tube modifications required by Alstom's proposal.  ECF No. 55-1 at 48-49.  As the court noted earlier in this opinion, it was not irrational for the SSA to expect that both Voith's and Alstom's proposals were likely to require draft tube modifications.  It was rational, then, for the SSA to not include the "tens of millions of dollars in cost" for Alstom's draft tube modifications in her best value tradeoff analysis.  Id. at 49.  More importantly, plaintiff has not shown how the SSA's best value analysis, which did not specifically mention or account for the cost of Alstom's draft tube modifications, violated the evaluation scheme set forth in the solicitation.

Turning to the advantages in Voith's proposal that may be described as performance efficiencies, plaintiff argues that the SSA's best value analysis ignored this "tremendous economic benefit" to the agency and its customers.  ECF No. 55-1 at 49.  Defendant argues that the benefits quantified by Voith are incorporated into the SSDD in the SSA's discussion of the strengths in Voith's Technical proposal.  ECF No. 69 at 29.  Thus, as Alstom points out, the SSA properly accounted for Voith's performance efficiencies in her best value analysis.  See ECF No. 70 at 54 ("[T]he SSA reasonably considered the various strengths and weaknesses in the offerors['] proposals as part of the comparative analysis, tradeoff, and best value determination.") (citing ECF No. 31-5 at 2-5).  Plaintiff has not shown that the SSA's best value analysis, which did not recognize the specific economic benefits identified by Voith as flowing from the performance efficiencies in its proposal, was either irrational or contrary to the evaluation scheme set forth in the solicitation.

2.      SSA's Use of "Illusory" Prices in the Best Value Tradeoff

According to Voith, the SSA "weigh[ed] Voith's technical superiority against a cost differential the agency itself had admitted, in its own documented price analysis, would be impossible to realize."  ECF No. 55-1 at 8.  Voith concludes, therefore, that the SSA's best value tradeoff analysis did not properly weigh the additional cost for the Corps to obtain the technical advantages in Voith's proposal.  See ECF No. 76 at 41 (citing 48 C.F.R. § 15.101-1(c) (2018)).  Both plaintiff and Alstom submitted additional authority on this topic, and the parties' presentations at oral argument covered this topic in detail.  The key to the resolution of this challenge to the tradeoff analysis lies in the solicitation.

There is no dispute that Price, Factor IV, required that the agency total all of the CLINs in each proposal, for both base and optional items.  ECF No. 23-11 at 589.  Plaintiff notes this solicitation requirement, but then states that the best value tradeoff, performed by the SSA in accordance with the solicitation's terms, violated the FAR.  ECF No. 55-1 at 46.  According to plaintiff, because the evaluated price of Voith's proposal was "artificially" disconnected from the actual expenses of contract

performance, the SSA's tradeoff decision was illogical and precluded by the FAR.  See id. ("While the Solicitation required the agency to evaluate offerors' relative standing on the unscored Price factor using this artificially inflated 'evaluated price,' the FAR's tradeoff procedure precludes the SSA from weighing the benefits of a superior technical proposal against added costs the Government well knows it can never, and will never, incur in the best-value tradeoff.").

While the court agrees that a number of the CLINs in Voith's proposal were deductive, in that certain optional CLINs would cause the cancellation of base CLINs, this is precisely the scheme that the agency presented to the offerors in the solicitation. When the SSA used the proposals' evaluated prices determined by Price, Factor IV, in her tradeoff analysis, the SSA adhered to the evaluation scheme that was disclosed to the offerors.  Thus, the approach used in the SSA's tradeoff analysis, as a whole, conformed with the RFP.

3.      Voith's Challenge to the Best Value Tradeoff Is Untimely

The court agrees with defendant and Alstom that plaintiff's critique of the evaluated price mechanism set forth in the solicitation, as that evaluated price is carried through in the tradeoff analysis, is not timely asserted.  ECF No. 69 at 35; ECF No. 70 at 53.  The proper time to have challenged the evaluated price methodology was pre-award, not post-award.  This type of challenge must be brought before proposals are received by the agency.  See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").  Under Blue & Gold Fleet, plaintiff's attempt to change the evaluation scheme of this procurement, post-award, is untimely.

The parties found a great deal of commentary in GAO decisions as to the timeliness of challenges to the rationality and propriety of an agency's price evaluation. See ECF Nos. 89-90.  None of these GAO decisions sustained a protest of a tradeoff analysis which incorporated an illusory evaluated price calculated pursuant to the terms of a solicitation.  In contrast, one of the GAO decisions cited by plaintiff specifically found that a challenge to a price evaluation scheme was untimely because it was brought after award.  See Trinity Ship Mgmt., LLC, B-416167, B-416167.2, 2018 CPD ¶ 214, 2018 WL 3101249, at *7 (Comp. Gen. June 19, 2018) (rejecting a post-award challenge to an "expressly stated" price evaluation scheme as untimely).  When this court and the GAO have considered post-award challenges to the prices used in a best value tradeoff analysis, those challenges have been found to be untimely if the offeror was on notice of the evaluation scheme.  See, e.g., Ocean Ships, Inc. v. United States, 115 Fed. Cl. 577, 592 (2014) (citing Blue & Gold Fleet, 492 F.3d at 1313); Am. Corr. Healthcare, Inc., B-415123.3, B-415123.4, B-415123.5, 2018 CPD ¶ 85, 2018 WL 1536745, at *5 (Comp. Gen. Jan. 2, 2018) (stating that if the protestor "believed this pricing evaluation scheme

to be inadequate, it should have protested this alleged solicitation impropriety before the closing time for receipt of proposals").

Even if plaintiff's challenge to the use of the proposals' evaluated prices in the best value tradeoff decision were timely, plaintiff has not established that a FAR violation occurred here.  Voith relies on two provisions, FAR 15.101-1 and FAR 15.308, which describe a tradeoff analysis component--the "additional cost" of the higher priced proposal.  ECF No. 55-1 at 45.  In FAR 15.101-1(c), the relevant phrase is "[t]he perceived benefits of the higher priced proposal shall merit the additional cost."  In FAR 15.308, the relevant phrase is "documentation [of the source selection decision] shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs."  Neither of these provisions directly address the question of whether an illusory evaluated price is an impermissible measure of the additional cost of the higher priced proposal.  Nor do any of the GAO decisions cited by plaintiff rely on these FAR provisions to invalidate a best value tradeoff analysis.  See ECF No. 90.

Defendant and Alstom argue that the FAR provisions cited by plaintiff actually support the SSA's best value tradeoff analysis, because these provisions require that the tradeoff be based on the evaluation criteria set forth in the solicitation.  ECF No. 69 at 35-36; ECF No. 70 at 53.  The court agrees that the SSA's best value tradeoff analysis has not been shown to violate these FAR provisions.  Further, even if plaintiff's challenge to the tradeoff analysis were timely, the court has found no legal authority that would permit this court to enjoin an award decision where the proposals' prices were evaluated pursuant to the methodology set forth in the solicitation, and those evaluated prices were then used in the agency's best value tradeoff analysis.[9]  For all of these reasons, the SSA's best value award to Alstom survives review.

## D.    Permanent Injunctive Relief Not Warranted

Plaintiff has not succeeded on the merits of its protest.  "Because proving success on the merits is a necessary element for a permanent injunction," no injunctive relief is

---

[9]    The GAO has noted that the evaluation of the offerors' prices in certain procurements is not always an exact science.  See MAR, a Div. of Oasis Sys., LLC, B-414810.5, 2018 CPD ¶ 266, 2018 WL 3868896, at *5 (Comp. Gen. July 26, 2018).  If the evaluated prices did not distort the price differences between the offerors, it is difficult to establish that the disappointed offeror was prejudiced by unrealistic evaluated prices, even in a best value tradeoff procurement.  Id. at *6.  Here, the SSA's use of the evaluated prices for Voith and Alstom in her best value tradeoff analysis has not been shown to have distorted the price differential between these proposals.

warranted in this case.  Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 999 & n.13 (Fed. Cir. 2018).  This protest must be dismissed.

E.    Plaintiff's Motion to Strike

Finally, the court addresses plaintiff's motion to strike the declaration of the SSA, Donna L. Street.  ECF No. 75.  Plaintiff requests that the SSA's declaration be stricken, or, alternatively, that the court "attribute no weight to the Street Declaration."  Id. at 1. Both defendant and Alstom oppose plaintiff's motion.  See ECF Nos. 78-79.  The dispute focuses on the purposes for which the declaration was submitted by defendant, and whether the court's consideration of that document is justified under this court's caselaw and the FAR.

In essence, the Street declaration, prepared after this litigation was well underway, discusses the price premium Ms. Street would not have been willing to pay for the "overall advantage for Voith in the combined non-price factors."  ECF No. 69-1 at 2. The price premium for Voith's proposal discussed in the SSA's contemporaneous SSDD was $267,161,904.  See id. at 1 (citing ECF No. 31-5 at 4).  The other price premiums the SSA would not have been willing to pay, according to her newly crafted declaration, are $148,928,550, or anything over $50,000,000.  Id. at 2 (citing ECF No. 31-5 at 40).  For its consideration of the merits of this protest, the court does not view the post hoc rationalization provided in the Street declaration to be relevant.  See, e.g., Sys. Eng'g Int'l, Inc., B-402754, 2010 CPD ¶ 167, 2010 WL 2861120, at *4 n.3 (Comp. Gen. July 20, 2010) (stating that when a "contracting officer's analysis is not reflected anywhere in the contemporaneous record[,] we give little weight to this post-hoc analysis").

Whether the court should consider the Street declaration for any sort of prejudice inquiry is a moot question, because the court, under the deferential standard of review applicable here, has found no error in the agency's contract award.  Similarly, because plaintiff has not prevailed on the merits in this protest, the potential use of the Street declaration for the fashioning of equitable relief is also a moot inquiry.  There is, therefore, no need to consider the Street declaration in this litigation.  Plaintiff's motion to strike the declaration of Ms. Donna L. Street is **DENIED**, even though the court accords no weight to the content of that document.

IV.   Conclusion

Accordingly,

(1)    Plaintiff's motion for judgment on the AR, ECF No. 55, is **DENIED**;

(2)    Defendant's cross-motion for judgment on the AR, ECF No. 69, is **GRANTED**;

(3)    Intervenor-defendant's cross-motion for judgment on the AR, ECF No. 70, is **GRANTED**;

(4)    Plaintiff's motion to strike the declaration of Donna L. Street, ECF No. 75, is **DENIED**;

(5)    The clerk's office is directed to **ENTER** final judgment for defendant and intervenor-defendant, **DISMISSING** plaintiff's complaint, with prejudice; and,

(6)    On or before May 17, 2019, the parties shall **CONFER** and **FILE** a **proposed redacted version** of this opinion, with any competition-sensitive or otherwise protectable information blacked out.

IT IS SO ORDERED.


s/Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Judge